THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID EVANS III, *et al.*, )<br>)<br>*Plaintiffs*, )<br>)<br>v. )<br>)<br>THOMAS J. DART, Sheriff of Cook )<br>County, Illinois; and COUNTY OF )<br>COOK, )<br>)<br>*Defendants*. ) | No. 18 C 6018<br><br>Judge Virginia M. Kendall |

**MEMORANDUM OPINION & ORDER**

Plaintiffs David Evans III, David Sheppard, Monta Servant, and Tabas Jackson are current or former correctional officers employed by the Cook County's Sheriff's Office ("CCSO") in the Cook County Department of Corrections. Each plaintiff was involved in an incident with a detainee for which they were subjected to CCSO's disciplinary procedure. Plaintiffs later sued Thomas J. Dart as Sheriff of Cook County and Cook County, claiming that similarly situated white employees received more lenient punishments in violation of the Equal Protection Clause. The Defendants move for summary judgment. (Dkt. 130). For the following reasons, the motion is granted. (*Id.*)

**BACKGROUND**

A. **CCSO Policies and Disciplinary Practices**

The Office of Professional Review ("OPR") is tasked with investigating misconduct by employees within the Department of Corrections. (Dkt. 153 ¶¶ 5–6). An investigation typically begins when someone files a complaint register, at which point an investigator is appointed. (*Id.*) The investigator then interviews witnesses, gathers evidence, and makes factual findings and conclusions as to whether any policies have been violated. (*Id.*) The investigator also prepares a

report, which supervisors within OPR review and approve. (*Id.* ¶ 6). The case then moves to the Command Channel Review ("CCR"), where a CCSO executive examines the investigation file and findings.[1] (*Id.* ¶ 8). The Undersheriff performs another review and provides her concurrence or rejection. (*Id.* ¶¶ 11–14). For suspensions greater than thirty days or termination recommendations, the CCSO must file a complaint before the Merit Board, a body established by state statute. (*Id.* ¶ 16). There, the case is assigned to a Merit Board member, who conducts a full evidentiary hearing. (*Id.* ¶¶ 17–18). After the hearing, the entire Merit Board reviews the record and issues a written decision, subject to review under the Administrative Review Law. (*Id.*) When the Department of Corrections seeks to dismiss a correctional officer, the person is entitled to a *Loudermill* hearing. (*Id.* ¶ 19).

Department policies prohibit race discrimination in any employment decision, including disciplinary decisions, and those who violate this guarantee are themselves subject to termination. (*Id.* ¶ 21). The department, though, never reviews the discipline in comparable cases to ensure disciplinary recommendations are free from discrimination, nor does any policy compel it do conduct such a review. (*Id.*)

**B.      Plaintiffs**

<u>David Evans III</u>. Evans was a correctional officer assigned to Tier 3-West at Cermak Hospital. (*Id.* ¶ 30). On December 16, 2015, he was involved in an accident with a detainee who used the arm of his wheelchair to break the glass in the door of the cell. (*Id.* ¶ 37). Evans entered the cell with Lieutenant Matthew Koedyker. (*Id.*) When Evans tried to remove the other arm from the wheelchair, the detainee attempted to block him. (*Id.*) In response, Evans allegedly struck the individual on the head, causing him to fall to the floor. (*Id.* ¶ 38).

---

[1] From 2015 to early 2016, a Disciplinary Review Board, comprised of members from several parties including Union representatives, would inspect the investigation and make a disciplinary recommendation. (*Id.* ¶ 10).

Two complaints were submitted against Evans: Koedyker reported the incident to the Superintendent, who filed a Complaint Register, and the detainee filed a separate Complaint Register. (*Id.* ¶¶ 40–41). The OPR opened an investigation. (*Id.* ¶ 41). Evans claimed that he acted in self-defense—the detainee, he said, attempted to use a wheelchair arm as a weapon and struck at him with "closed handed strikes." (*Id.* ¶ 43). Koedyker told a different story: he believed Evans used excessive force. (*Id.* ¶ 42). OPR attempted to interview Evans without success. (*Id.* ¶ 44). In the end, the office concluded that Evans used excessive force and that Evans's official report was inaccurate. (*Id.* ¶ 45). Undersheriff Zelda Whittler reviewed and approved the findings and recommended Evans's employment be terminated. (*Id.* ¶ 46). The Merit Board examined the video evidence and listened to Koedyker testify but ultimately ordered Evans be reinstated to his position. (*Id.* ¶¶ 48–49).

Tabas Jackson. On January 24, 2016, Jackson, also a correctional officer, allegedly exchanged words with a detainee, Anthony Asare, who was seated with his hands cuffed behind his back. (*Id.* ¶¶ 51–52). Jackson then grasped Asare by the throat. (*Id.* ¶ 52). Upon seeing the throat-hold, Correctional Officer William Carnes grabbed Jackson's harm to pull it off, while a different detainee, Eddy Redmond, attempted to place his body between Jackson and Asare. (*Id.*) Jackson then released his grip on Asare only to grab Redmond's throat instead. (*Id.*)

Asare filed a Complaint Register against Jackson for choking him and Redmond. (*Id.* ¶ 53). After reviewing surveillance video of the incident, Superintendent Salmon Martinez also filed a Complaint Register. (*Id.*) OPR investigated the incident. (*Id.* ¶ 54). In a sworn interview, Jackson denied every choking Asare and Redmond; instead, he claimed that he only placed his hands on them to hold them down after they became agitated. (*Id.* ¶¶ 56–58). OPR concluded that Jackson used excessive force; two other corrections officers along with Jackson failed to document or

notify their superiors of the incident; and Jackson made a false report and false statements in his official report. (*Id.* ¶ 61). Undersheriff Whittler agreed with the findings and determined that Jackson's employment should be terminated. (*Id.* ¶ 62). The Merit Board, after a trial, ordered his termination. (*Id.* ¶¶ 64–65).

Monta Servant. Servant was assigned to a housing unit for "acute psyche" detainees. (*Id.* ¶ 66). On April 2, 2015, Servant allegedly placed a detainee in a "chokehold" by grabbing him from behind, placing his arm around the person's neck, and pulling the detainee backward by the neck. (*Id.* ¶¶ 68–69). Servant used this technique to walk the detainee down the hallway into an isolation cell. (*Id.*) The Sheriff Office's Orders, however, prohibit chokeholds except "as a last resort … to prevent imminent death or great bodily harm to the officer or another person." (*Id.* ¶ 71). The detainee here was not engaging in aggressive behavior, so the use of a chokehold, if proven, was unwarranted. (*Id.*)

On May 15, 2015, the Use of Force Review unit recommended supplemental training for Servant. (*Id.* ¶ 72) As a result, OPR opened an investigation. (*Id.* ¶ 73). Servant denied, in his sworn interview, ever using the maneuver. (*Id.* ¶ 74). OPR found that this characterization was inaccurate and that the use of a chokehold was unjustified. (*Id.* ¶¶ 75–76). The disciplinary board recommended that Servant's employment be terminated, and Undersheriff Whittler agreed. (*Id.* ¶ 77). The Merit Board sided with Servant though—over the dissent of one member—and Servant was allowed to return to work. (*Id.* ¶ 78).

Delphine Bridges. A detainee reported that Bridges took his property bag, ordered him handcuffed, and hit him with her keys several times. (*Id.* ¶¶ 79–81). The video testimony purportedly showed the detainee had a visibly swollen eye with red marks below the socket, and

4

he was at some point taken for medical attention and treated for swelling and a corneal abrasion. (*Id.* ¶¶ 82–83).

The detainee submitted a Complaint Register against Bridges, and OPR began investigating the allegations. (*Id.* ¶¶ 84–85) Bridges acknowledged interacting with the detainee but denied causing him or his property any harm. (*Id.* ¶ 86). Nonetheless, OPR believed there was enough evidence to sustain the misconduct allegations. (*Id.* ¶¶ 87–90) Surveillance video revealed Bridges slapping the property bag out of the detainee's hand, and although the video moved away from the scene after that point, four other detainees corroborated the account in addition to the medical records. (*Id.* ¶ 87). Thus, it concluded Bridges used impermissible force, never reported the incident, made false statements, and neglected to help the detainee receive medical care. (*Id.* ¶¶ 89–90). Undersheriff Whittler recommended that her employment be terminated, and the Merit Board agreed. (*Id.* ¶¶ 90, 99)

**C.     Procedural History**

Plaintiffs sued Thomas J. Dart in his official capacity as Cook County Sheriff and Cook County, bringing disparate treatment and disparate impact claims under Title VII of the Civil Rights Act of 1964 (Counts I & II); equal protection and due process claims under § 1983 (Counts III & IV); a § 1981 claim against Sheriff Dart (Count V); and indemnification from Cook County (Count VI). (*See generally* Dkt. 1). The defendants moved to dismiss all counts for failure to state a claim. Fed. R. Civ. P. 12(b)(6). This Court granted the motion for Counts I, II, and IV but denied it for Counts III (equal protection), V (§ 1981), and VI (indemnification). (Dkt. 113 at 9). On Count III, plaintiffs sufficiently alleged that the defendants did not ensure consistency in disciplinary outcomes, resulting in discrimination against non-Caucasian officers because similarly situated Caucasian officers received more lenient sanctions. (*Id.* at 5–6). And because the complaint stated

5

an equal-protection claim, plaintiffs' § 1981 and indemnification claims survived, (*id.* at 7–9). The defendants now move for summary judgment on the remaining three counts. (Dkt. 130).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court construes all facts in favor of the nonmoving party and does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). The "one task and one task only" is to decide whether there is a "any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770–71 (7th Cir. 2003) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). A genuine issue of material fact exists when there is "sufficient evidence" for a jury to return a verdict in favor of the nonmoving party. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## DISCUSSION

**I.    Equal Protection Claim (Count III)**

Plaintiffs seek to recover damages from the municipal defendants based on alleged violations of the Equal Protection Clause. To succeed, they must show a deprivation of a federal right that can be traced to a policy attributable to the municipality itself. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021).

**A.    Underlying Constitutional Violation**

Plaintiffs do not clearly articulate what federal right they were deprived of and how the government caused the deprivation. They simply assert that "there is a widespread custom at the

6

CCSO of recommending discipline without controlling for race discrimination given to other officers based on similar alleged misconduct." (Dkt. 152 at 7). But no attempt is made to root this statement in any constitutional provision, statute, or caselaw—mostly likely because no support exists for the claim. The suggestion that the government must take *affirmative* steps to eradicate disparate-impact racism runs counter to the general maxim that the Constitution is "a charter of *negative* liberties." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000). The document "creates areas in which the government has to let people alone; it does not entitle them to demand" specific actions. *Id.*; *see generally* David P. Currie, *Positive and Negative Constitutional Rights*, 53 U. Chi. L. Rev. 864 (1986). More likely, plaintiffs mean to argue that the relevant decisionmakers acted with an impermissible motive in doling out discipline to correctional officers within the department, which if true and properly supported would violate plaintiffs' federal rights. Plaintiffs, however, cannot establish the necessary discriminatory purpose to make out a successful claim.

The Equal Protection Clause provides no state "shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. A plaintiff alleging an equal-protection violation "has the burden of proving 'the existence of purposeful discrimination'" based on race. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)). An "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977*)*; *see also Washington v. Davis*, 426 U.S. 229, 239 (1976) ("[T]he invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose."). A "discriminatory purpose or intent" is required. *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (quoting *Arlington Heights*, 429 U.S. at 265). A "discriminatory purpose …

7

implies that the decisionmaker … selected or reaffirmed a particular course of action … 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'n of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (footnote omitted); *see also Conley v. United States*, 5 F.4th 781, 789 (7th Cir. 2021).

Plaintiffs lack any direct evidence that the decisionmakers within the Department of Corrections acted with a discriminatory purpose in allegedly punishing them more harshly than their white counterparts. Instead, they rely on comparisons of the disciplines between Black and white employees. Putting aside the possibility that factual distinctions account for the different penalties, the sole reliance on a form of rough statistics is insufficient to prevail here. "Only in 'rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation." *Chavez v. Ill. St. Police*, 251 F.3d 612, 647 (7th Cir. 2001). Statistical evidence might be accepted as proof of an equal-protection violation in the selection of a jury venire for a particular district, *Arlington Heights*, 429 U.S. at 266, for statutory violations of Title VII, *Bazemore v. Friday*, 478 U.S. 385, 400–01 (1986) (Brennan, J., concurring), and possibly for challenges to legislative redistricting, *Hunt v. Cromartie*, 526 U.S. 541, 548–49 (1999). *See generally Chavez*, 251 F.3d at 647. This case, however, presents none of these circumstances. Therefore, the plaintiffs have not shown how the decisionmakers in their respective cases acted with the requisite discriminatory intent, and consequentially, they cannot demonstrate a violation of the Equal Protection Clause.

### B. Municipal Liability

Even if plaintiffs could establish that county decisionmakers discriminated against them because of their race, they falter in their attempt to hold the municipal defendants directly liable for the alleged violations of their constitutional rights. Section 1983 creates a private cause of

8

action to seek a remedy against "[e]very person" who under the color of state law "causes … the deprivation of any rights, privileges or immunities secured by the Constitution." 42 U.S.C. § 1983. A municipality is a "person" within the meaning of § 1983, but "the statute does not incorporate the common-law doctrine of respondeat superior, so a municipality cannot be held liable for the constitutional torts of its employees and agents." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021); *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Rather, a municipality can only be liable "for *its own* violations of the federal Constitution and laws." *LaPorta*, 988 F.3d at 986 (emphasis added). A plaintiff seeking to hold a municipality liable must establish three elements: a policy or custom (or lack thereof); municipal fault; and a causal link between the alleged action and the deprivation of "rights, privileges or immunities secured by the Constitution." 42 U.S.C. § 1983; *see also Dean*, 18 F.4th at 235.

      *i.*      *Municipal Action*

A municipal "action" can come in one of three forms: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Dean*, 18 F.4th at 235 (quoting *LaPorta*, 988 F.3d at 987). Alternatively, in rare cases, inaction can give rise to liability where "it reflects 'a conscious decision not to take action.'" *Id.* (quoting *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (en banc)). Plaintiffs rely on an inaction theory: specifically, the CCSO's failure to control for race discrimination in disciplinary recommendations. (Dkt. 152 at 9). The "path to *Monell* liability based on inaction," however, is much "steeper because, unlike in a case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous." *J.K.J. v. Polk County*, 960 F.3d 367, 378

9

(7th Cir. 2020) (en banc). Therefore, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cnty. Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405 (1997).

### ii. Municipal Fault

Municipal fault requires evidence that "policymakers were deliberately indifferent to a known risk that [a] policy would lead to constitutional violations." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020). Deliberate indifference is "a high bar." *LaPorta*, 988 F.3d at 986. There are two limited means by which a plaintiff can establish culpability. *Taylor v. Hughes*, 26 F.4th 419, 435 (7th Cir. 2022). The first and most straightforward one occurs when the municipality maintains an "express municipal policy or affirmative municipal action [that] is itself unconstitutional." *Id.* "In such cases, a single instance of a constitutional violation caused by the policy suffices to establish municipal liability." *Id.* The second method involves "situations in which a municipality has knowingly acquiesced in an unconstitutional result of what its express policies have left unsaid." *Id.* On this path, a plaintiff must show either "a prior pattern of similar constitutional violations," *Dean*, 18 F.4th at 236, or—in rare and exceptional circumstances—that "'the unconstitutional consequences' of municipal inaction are 'so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations,'" *Taylor*, 26 F.4th at 435–36 (quoting *Connick v. Thompson*, 563 U.S. 51, 64 (2011)).[2]

Plaintiffs chose to proceed exclusively on the most difficult path—that Cook County maintained a policy in which it was patently obvious that unconstitutional consequences would

---

[2] *See also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) (plurality); *Bohanon v. City of Indianapolis*, 46 F.4th 669, 677 (7th Cir. 2022); *Stockton v. Milwaukee County*, 44 F.4th 605, 616–18 (7th Cir. 2022); *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 567–68 (7th Cir. 2021); *Calderone v. City of Chicago*, 979 F.3d 1156, 1164 (7th Cir. 2020); *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019); *Glisson*, 849 F.3d at 382; *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016); *Hahn v. Walsh*, 762 F.3d 617, 638 (7th Cir. 2014).

occur. This decision is logical. It would be impossible to claim that a municipality both does not have a policy and maintains one that is facially unconstitutional, and the record is devoid of any prior pattern of similar constitutional violations. But, as explained above, rarely does a municipality have a policy or lack of policy that is "so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64.

The absence of a control system for race discrimination in CCSO disciplinary recommendations did not create patently obvious constitutional deficiencies rising to deliberate indifference. To begin, the CCSO had rigorous procedures to ensure fairness and accuracy throughout the disciplinary process (which remain largely unchanged). First, the Office of Professional Review conducted investigations into allegations of serious misconduct. Investigators reviewed the alleged facts, interviewed witnesses, went over accompanying documentation, and rendered a final opinion. (Dkt. 153 ¶¶ 4-5). The final report was sent to the Squad Director and Executive Director, who both had the authority to disagree. (*Id.* ¶ 6). Second, the case went to the Command Channel Review for a review of the investigation file and findings. (*Id.* ¶ 8). Third, Undersheriff Whittler examined all the cases sent to her, looking for consistency in the investigation and thoroughness of the report. (*Id.* ¶ 9). She then would either concur or decline to concur. (*Id.*) If she declined to concur, the file would be sent back to OPR for additional action.[3] (*Id.*) Fourth and finally, the Merit Board reviewed any punishment greater than a thirty-day suspension, as only it could impose such a sentence. (*Id.* ¶ 15). When the CCSO filed a disciplinary complaint before the board, a member was assigned to conduct a trial, where parties could call witnesses, present evidence, and cross-examine witnesses. (*Id.* ¶ 18). The Board then made factual

---

[3] For a brief time, a Disciplinary Review Board would also review the file before it was sent to the head of the department; eventually, that added layer was removed, and the bureau chief took over the role from the Undersheriff. (*Id.* ¶¶ 10, 13–14).

findings and issued a written decision, subject to additional procedures under the Administrative Review Law. (*Id.*) In cases where the sought punishment was termination, the board conducted a *Loudermill* hearing to determine whether the employee should be suspended without pay. (*Id.* ¶ 19).

This multistep procedure for imposing discipline could hardly be considered blatantly unconstitutional, and the plaintiffs cannot point to any step in the process that inaction obviously results in racial discrimination. Rather, it ensured just and fair results for correctional officers accused of misconduct. Additionally, the CCSO has detailed rules to protect against the harms alleged by plaintiffs. Specifically, it has written policies prohibiting racial discrimination, which extend to employment decisions such as those involving discipline. (*Id.* ¶ 21). Employees violating this protection—that is, any employee intentionally discriminating against another employee based on race—can have their employment terminated. (*Id.*) The antidiscrimination policy also expressly provides training and options for employees to report violations.

Moreover, uncontradicted expert testimony shows that the CCSO maintains accepted, industry-wide standards for employee discipline and antidiscrimination. (Dkt. 131-77 at 11). A full analysis of CCSO's relevant documents indicated that they follow *Illinois County Jail Standards*, as defined in the Illinois Administrative Code, the *Performance-Based Standards for Adult Local Detention Facilities*, and the *Core Jail Standards*, an authority established by the American Correctional Association. (*Id.* at 15). An agency "operating any local correctional/detention system has enormous and complex responsibility for public safety." (*Id.* at 16). The process in place ensures "the development of a high-quality workforce" that considers the "unique facts of each case in order to hold all staff accountable … and to help ensure the agency can achieve its public safety mission and objectives." (*Id.* at 17).

The Seventh Circuit has only recognized three instances where sufficient evidence existed to establish a "patently obvious" policy, and each is readily distinguishable. *See Polk County*, 960 F.3d 367; *Glisson*, 849 F.3d 372; *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917 (7th Cir. 2004). In *J.K.J. v. Polk County*, the municipality never created policies to detect and prevent sexual assault committed by male guards against female inmates. 960 F.3d 367. Additionally, the county was aware of sexual misconduct occurring in the jail; delivered a wholly inadequate punishment for a guard who sexually assaulted inmates; and failed to develop or implement any guidance on preventing, detecting, and responding to sexual assault. *Id.* at 381–84. Similarly, in *Glisson v. Indiana Department of Correction*, the municipality had no protocols for "coordinated, comprehensive treatment" that posed a danger to chronically ill inmates. 849 F.3d at 382. And finally, in *Woodward*, the municipality barely, if at all, trained its employees on suicide prevention and lacked any diligence in reviewing important mental health documents as well as adhering to established standards. 368 F.3d at 927–28. But there are no such widespread gaps or pervasive abandonment of duties here. CCSO never learned of any racial discrimination (a perennial problem for plaintiffs' argument) or entirely failed to discipline white offenders compared to their Black colleagues. Furthermore, it developed and implemented a rigorous process to evaluate disciplinary problems within the department, a process that conformed to industry-wide standards and was closely adhered to.

      *iii.*    *Causation*

"It 'is an explicit requirement of § 1983 and an uncontroversial application of basic tort law' that a plaintiff must prove that the defendant caused his injury." *Bohanon v. City of Indianapolis*, 46 F.4th 669, 677 (7th Cir. 2022) (quoting *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 306 (7th Cir. 2010)). Causation under *Monell* means the municipal action "was the

13

moving force behind the federal-rights violation." *Dean*, 18 F.4th at 235 (quoting *LaPorta*, 988 F.3d at 987) (cleaned up); *see also Brown*, 520 U.S. at 404 ("[A] plaintiff … must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."). Moving-force causation is a "rigorous causation standard that guards against backsliding into respondeat superior liability." *LaPorta*, 988 F.3d at 987. Here again, plaintiffs fall short of establishing *Monell* liability because they cannot articulate how the use of a control matrix would have redressed their specific injuries. *See, e.g.*, *Bohanon*, 46 F.4th at 677 (emphasizing that the moving-force causation standard "is particularly rigorous when the plaintiff claims that the municipality has not directly caused the injury"). The absence of this causal link provides the final flaw in plaintiffs' case.

## II. Section 1981 and Indemnification (Counts V & VI)

This Court previously decided that the success of Plaintiffs' § 1981 and indemnification claims were linked. (Dkt. 113 at 7–9). The same is still true. Because the defendants are entitled to summary judgment on the equal-protection claim, summary judgment in their favor is appropriate on the remaining counts as well.[4]

## CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment is granted. (Dkt. 130).

Virginia M. Kendall
United States District Judge

Date: September 29, 2022

---

[4] Given this determination, there is no need to consider defendants' alternative argument that one plaintiff's claims (those of Servant) are barred by the statute of limitations. (Dkt. 131 at 14–15).

14